Fee Paid

FILED
CLERK, U.S. DISTRICT COURT

**6/10/2020**

CENTRAL DISTRICT OF CALIFORNIA
BY: ___DD___ DEPUTY

1  **William K. Hanagami, SBN 119832**
   **HANAGAMI LAW**
2  **A PROFESSIONAL CORPORATION**
   **913 TAHOE BOULEVARD, SUITE 5**
3  **INCLINE VILLAGE, NV 89451-7414**
   **(833) 716-8570 / (833) 716-8569** *FAX*
4  **Bill@Hanagami.com**

5  **Abram J. Zinberg, SBN 143399**
   **THE ZINBERG LAW FIRM**
6  **A PROFESSIONAL CORPORATION**
   **412 OLIVE AVENUE, SUITE 528**
7  **HUNTINGTON BEACH, CA 92648-5142**
   **(714) 374-9802 / (714) 969-0910** *FAX*
8  **AbramZinberg@gmail.com**

RECEIVED
CLERK, U.S. DISTRICT COURT

**6/8/2020**

CENTRAL DISTRICT OF CALIFORNIA
BY: ___DD___ DEPUTY

9  Attorneys for Plaintiff and *Qui Tam* Relator,
   Paul Pew
10

11              UNITED STATES DISTRICT COURT

12              CENTRAL DISTRICT OF CALIFORNIA

13

| | |
|---|---|
| 14  UNITED STATES OF AMERICA, *ex rel* PAUL PEW, | CASE NO.: 2:20-cv-05156-RSWL(ASx) |
| 15          Plaintiff, | COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT;  REQUEST FOR JURY TRIAL |
| 16  vs. | |
| 17  SEOUL MEDICAL GROUP, INC., a California corporation, ADVANCED MEDICAL MANAGEMENT, INC., a California corporation, | |
| 18 | |
| 19 | **[UNDER SEAL** PER 31 U.S.C. § 3730(b)(2)] |
| 20          Defendants. | |

21       COMES NOW, Plaintiff and *Qui Tam* Relator Paul Pew, individually and on behalf of

22  the United States of America, and alleges as follows:

23

24              JURISDICTION AND VENUE

25       1.    Plaintiff and *Qui Tam* Relator Paul Pew (Relator) files this action on behalf and

26  in the name of the United States Government (Government) seeking damages and civil

27  penalties against the defendants for violations of 31 U.S.C. § 3729(a). Relator further files this

28  action in his individual capacity for violations of 31 U.S.C. § 3730(h).

-1-

2.      This Court's jurisdiction over the claims for violations of 31 U.S.C. §§ 3729(a) and 3730(h) is based upon 31 U.S.C. § 3732(a).

3.      Venue is vested in this Court under 31 U.S.C. § 3732(a) because at least one of the defendants transacts business in the Central District of California and many acts constituting violations of 31 U.S.C. §§ 3729(a) and 3730(h) occurred in the Central District of California.

THE PARTIES

4.      Relator is a resident and citizen of the United States, the State of California, and of this District.  Relator brings this action of behalf of the Government under 31 U.S.C. § 3730(b).  Defendant Advanced Medical Management, Inc. (AMM), a healthcare operation management and business consulting company.  Relator began his employment with AMM as its Vice President of Operations during or about February 1994.  During or about 2009, Relator became AMM's Executive Vice President and Chief Financial Officer (CFO).  AMM constructively terminated Relator's employment on or about March 19, 2019.  One of AMM's clients is and was defendant Seoul Medical Group, Inc.

5.      At all times relevant, the Government funded the Medicare program which provides payment of healthcare services for, among others, those 65 years or older.  The Government provided a Medicare option known as Medicare Advantage (MA), in which eligible Medicare beneficiaries can enroll under a MA health plan with a Medicare Advantage Organization (MAO) contracted with the Government for a capitated rate paid by the Government that would provide at least those services provided to standard Medicare beneficiaries.

6.      Defendant Seoul Medical Group, Inc. (SMG) is and was a corporation formed under the laws of the State of California, and transacted business in, among other places, the Central District of California.  At all times relevant, SMG is and was a medical group that contracted with a number of MAOs, including but not limited to Anthem Blue Cross, Blue Shield, Brand New Day, Central, Easy Choice, Health Net, Humana, O'Hana, SCAN Health Plan, and United Healthcare to provide healthcare services to their MA beneficiaries.

7. During and between 2015 and at least 2019, SMG conducted medical group operations in Los Angeles, Orange and Santa Clara counties in California, in addition to those in the states of Washington, Hawaii, Georgia, New Jersey and New York. Within these six (6) states, SMG had more than 150 primary care physicians (PCPs) and more than 1,000 specialty physicians. SMG was also in the process of expanding into Las Vegas, northern Virginia, Dallas and Houston areas. As of the end of 2018, SMG had about 14,000 MA patients assigned by its various contracted MAOs.

8. Defendant Advanced Medical Management, Inc. (AMM) is and was a corporation formed under the laws of the State of California, and transacted business in, among other places, the Central District of California. At all times relevant, AMM was a healthcare operational management and business consulting company, that, among other things, reviewed and audited SMG's financial and medical records during and between 2012 and at least 2019.

9. During or about June 7, 2018, SMG and/or one of its subsidiaries purchased all outstanding shares of AMM, and became its sole shareholder.

## RISK ADJUSTMENT

10. At all times relevant, Section 1853(a)(3) of the Social Security Act [42 U.S.C. § 1395w-23(a)(3)] required the Government's Centers for Medicare and Medicaid Services (CMS) to risk adjust payments to MAOs. In general, the risk adjustment methodology relied on enrollee diagnoses, as specified by the International Classification of Disease, Ninth Revision Clinical Modification guidelines (ICD-9), and later the International Classification of Disease, Tenth Revision Clinical Modification guidelines (ICD-10), to prospectively adjust capitation payments for each enrollee based on the health status of the enrollee. Diagnosis codes (ICD-9/ICD-10 codes) submitted by MAOs to CMS were used to develop Hierarchical Condition Category (HCC)[1] risk scores that are used by CMS to adjust the capitated payment rates paid by CMS to that particular MAO. The risk scores compensated an MAO with a

---

[1]Not all diagnoses result in a HCC risk score. Only certain diagnosis codes or combinations thereof result in HCC risk scores. A HCC risk score will vary upon the diagnosis codes of combinations thereof according to a matrix determined by the Government.

population of patients with more severe illnesses than normal through higher capitation rates. Likewise, an MAO with a population of patients with less severe illnesses than normal would see a downward adjustment of its capitation rates because it was servicing a healthier than normal population of patients. By risk adjusting MAO payments, CMS attempts to make appropriate and accurate payments to MAOs for enrollees with differences in expected healthcare costs. Risk adjustment data (RAD), which include diagnosis codes, records the health status and demographic characteristics of an enrollee.

11. At all times relevant, SMG provided medical services to MA patients of, and under various contracts with, the above-mentioned MAOs. In turn, these MAOs transmitted to CMS the diagnosis codes of its MA patients receiving treatment from SMG to develop HCC risk scores that CMS used to risk adjust the capitated payment rates paid to such MAOs. In turn, SMG received about 40% of the capitated payments paid by CMS to the MAOs that were attributable to such MAOs' MA beneficiaries that were assigned by the MAOs to SMG to provide medical treatment. Thus, SMG also received a portion of any increase in capitated payments paid by CMS to the MAOs resulting from inflated or false diagnosis codes of SMG MA patients.

12. Under applicable Medicare regulations, including but not limited to 42 C.F.R. §§ 422.310(d) and 422.504(*l*), and CMS's Risk Adjustment Guide, only diagnosis codes that are truthful and supported by properly documented medical charts can be submitted to MAOs and CMS for risk adjustment purposes. "All diagnosis codes must be documented in the medical record and must be documented as a result of a face-to-face visit. . . ." Medicare Managed Care Manual, Ch. 7, § 40.

SMG'S FRAUDULENT SCHEME

13. During and between 2015 and at least 2019, SMG systematically upcoded its RAD using diagnosis codes in HCC categories that are unsubstantiated in the SMG patients' medical charts. This upcoding resulted in disproportionately high HCC risk scores that inflated CMS's capitated payments to the MAOs of such SMG patients without corresponding medical treatments for such high-acuity patients. Relator is informed and believes, and upon

-4-

1    such information and belief alleges, that SMG receives a significant portion of such inflated
2    capitated payments paid to the MAOs of such SMG patients.  As discussed below, SMG also
3    took efforts to fabricate and alter medical records to conceal its fraudulent misconduct.

4    14.    At all time relevant, Relator was privy to SMG's financial records, audit results,
5    compliance activities, business development presentations, and confidential communications.

6    15.    When AMM began its healthcare operational management services for SMG
7    during 2012, SMG had only about 600 MA patients from a single MAO.  By the end of 2018,
8    SMG had about 14,000 MA patients assigned to it by MAOs, including but not limited to
9    Anthem Blue Cross, Blue Shield, Brand New Day, Central, Easy Choice, Health Net, Humana,
10   O'Hana, SCAN Health Plan, and United Healthcare.  Relator is informed and believes, and
11   upon such information and belief alleges, that SMG had more than 14,000 MA patients by the
12   end of 2019.

13   16.    During and between 2015 and at least 2019, SMG regularly instructed its
14   physicians to diagnose patients with various HCC diagnoses to in order to generate excessive
15   capitated payments to SMG's contracted MAOs, of which SMG would received a substantial
16   portion.  Such instructions included oral presentations by SMG's CEO, Min Young Cha, M.D.,
17   and the circulation of lists of such HCC diagnoses and diagnosis codes.  Such diagnoses
18   included, but were not limited to, hepatitis, arthritis, immunity disorders, coagulation defects,
19   drug and alcohol dependence, angina pectoris, vascular disease, spinal enthesopathy, and
20   autoimmune disorders.

21   17.    During 2017, Health Net, one of SMG's contracted MAOs, questioned SMG
22   about SMG's "dramatically increasing risk scores" arising from its 2016 RAD submission.
23   However, SMG's Min Young Cha, M.D. and Ho Bae, M.D. convinced Health Net that the
24   incident of such diagnosis codes were unique to the Korean patients served by SMG.

25   18.    During 2017, AMM recommended to SMG that it agree to a corrective action
26   plan to address SMG's practice of submitting RAD using diagnosis codes that were
27   unsupported by properly documented medical charts.  However, SMG refused to do so.

28   19.    During 2017 and the first half of 2018, AMM reviewed numerous medical charts

-5-

1    of SMG MA patients, and found that numerous HCC submitted by SMG diagnoses, including
2    many of the diagnoses identified on paragraph 16, were not supported by the SMG patients'
3    medical charts. As a result, AMM recommended to SMG that it withhold 31.5% of its
4    scheduled PCP bonuses to mitigate any retraction of revenue due to the unsupported RAD
5    submitted to the MAOs, which in turn were submitted to CMS. AMM determined that the
6    unsupported RAD arising from encounters between 2015 and mid-2017 resulted or would
7    result in more than $6.7 million in MA overpayments to SMG from its contracted MAOs,[2] and
8    recommended that SMG withdraw those unsupported diagnosis codes. Further, AMM
9    presented SMG with a plan to correct and withdraw the unsupported diagnosis codes and the
10    timetable to do so. However, SMG refused to do so.

11       20.     During or about 2018, AMM's executive management developed a corrective
12    action plan to address SMG's practice of submitting RAD using diagnosis codes that were
13    unsupported by properly documented medical charts. However, SMG refused to adopt the
14    corrective action plan or otherwise take corrective action to address and correct SMG's
15    practice of submitting RAD using diagnosis codes that were unsupported by properly
16    documented medical charts.

17       21.     On or about June 7, 2018, SMG and/or its subsidiary purchased AMM and
18    subsequently removed, terminated and/or constructively terminated AMM personnel, including
19    Relator, in an effort to prevent any correction to SMG's RAD coding practices, and to avoid
20    withdrawing its previously reported unsupported diagnosis codes from the MAOs and CMS.

21       22.     During December 2018, AMM's Compliance Committee advised SMG of
22    numerous coding submissions that constituted fraud, waste and abuse, that included, among
23    other things, the diagnoses identified in Paragraph 16. In spite of AMM's recommendation
24    that a number of SMG medical charts be audited and reviewed, but SMG refused to allow the
25    review and audit of SMG medical charts prepared by SMG board members.

26       23.     During a February 2019 SMG Orange County Division Board meeting, Sora

27

28      [2]Because SMG received about 40% of CMS's capitated payments to SMG's contracted MAOs for SMG's assigned MA patients, CMS paid SMG's contracted MAOs more than $16.75 million as a result of SMG's unsupported RAD arising from encounters between 2015 and mid-2017.

1    Park, R.N., stated that the Board had increased the HCC risk scores of its MA patients by,
2    among other things, circulating lists of suggested and commonly used HCC diagnosis codes
3    for use on all MA patients and engaging Park to re-write and/or modify physician chart notes
4    of patient encounters in which she did not participate in order to support such HCC diagnosis
5    codes. SMG specifically paid Park to re-write and/or modify physician chart notes to support
6    previously submitted HCC diagnosis codes that were unsupported by properly documented
7    medical charts of patients in, among other places, Los Angeles County and Santa Clara County
8    SMG PCP medical offices. Relator addressed his concerns about Park's comments with SMG.
9    Relator is unaware of any corrective action taken by SMG.

10         24.    SMG made no effort to advise CMS or its contracted MAOs that the false
11    diagnosis codes were untruthful and unsupported by proper and truthful medical
12    documentation, and made no effort to (a) identify and withdraw from its contracted MAOs or
13    CMS the false diagnosis, or (b) return overpayments to the MAOs or CMS as a result of
14    SMG's submission of the false diagnosis codes.

15         25.    SMG made no effort to advise or withdraw from its contracted MAOs or CMS
16    the false diagnosis codes, even after AMM advised SMG to do so.

17         26.    At all times relevant, SMG knew that the false diagnosis codes were untruthful
18    and not supported by truthful and properly documented medical records, but nonetheless
19    submitted them to SMG's contracted MAOs with the knowledge and intent that such MAOs
20    would submit such false diagnosis codes to CMS and inflate their MA patients' risk scores,
21    resulting in CMS paying inflated capitation payments to the MAOs for such MA patients, of
22    which SMG received a portion.

23         27.    42 C.F.R. § 422.504(*l*)(3) requires SMG to periodically certify as to the
24    accuracy, completeness, and truthfulness of the RAD it submitted to its MAO clients. Relator
25    is informed and believes, and upon such information and belief alleges, that at least annually
26    during all times relevant, SMG submitted certifications required by 42 C.F.R. § 422.504(*l*)(3)
27    falsely certifying that the RAD it generated and submitted was accurate, complete and truthful.
28    SMG's certifications were knowingly false and fraudulent because SMG knew that the false

diagnosis codes submitted to its contracted MAOs were untruthful and not supported by truthful and properly documented medical records. Further, by submitting RAD to its contracted MAOs, knowing that such RAD would be submitted to CMS, SMG impliedly certified that its submitted RAD was accurate, complete and truthful under 42 C.F.R. § 422.504(*l*)(3).

28.    SMG's express and/or implied certifications were knowingly false. SMG conducted a noncompliant and fraudulent practice of behavior that included, but was not limited to (a) knowingly submitting RAD to its contracted MAOs that were false and were not supported by properly documented medical charts, (b) knowingly submitting false 42 C.F.R. § 422.504(*l*)(3) certifications with the knowledge that SMG had submitted RAD to its contracted MAOs that were false and were not supported by properly documented medical charts, and (c) failing and refusing to identify and withdraw the submitted false RAD from its contracted MAOs and CMS.

29.    As a result of the acts and concealments of SMG, Relator is informed and believes, and upon such information and belief alleges, that CMS paid inflated capitated payments in excess of $20 million to SMG's contracted MAOs due to the artificially high HCC risk scores resulting from SMG's submission of false HCC diagnosis codes during and between 2015 and at least 2019, of which such MAOs paid SMG in excess of $8 million.

## FIRST CLAIM FOR RELIEF

(Violation of 31 U.S.C. § 3729(a) against all defendants)

30.    Relator realleges and incorporates by reference all prior paragraphs of this complaint as though fully set forth at length.

31.    At all times mentioned, SMG routinely and repeatedly violated 31 U.S.C. § 3729(a)(1) by:

      i.    Knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval to the Government and/or MAOs;

      ii.    Knowingly making, using, and/or causing to be made or used, false

-8-

records or statements material to false or fraudulent claims for payment or approval to the Government and/or MAOs;

iii.  Knowingly making, using and/or causing to make or use false records and statements material to an obligation to pay or transmit money to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing its obligation to pay or transmit money to the Government or MAOs by failing and refusing to (a) withdraw from its contracted MAOs and CMS the previously submitted false diagnosis codes that were untruthful and unsupported by truthful and properly documented medical records, and (b) return to the MAOs and/or CMS the inflated payments and funds it received as a result of its submission of such false diagnosis codes.

32.    As a result of its conduct, defendant is liable to the Government for three times the amount of damages sustained by the Government as a result of the false and fraudulent billing, reporting, records, statements, claims and/or concealment practices alleged above.

33.    As a result of defendant's conduct, 31 U.S.C. § 3729(a)(1) provides that defendant is liable to the Government for civil penalties between $5,000 and $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, for each such false and fraudulent billing, reporting, records, statements, claims and/or concealment.

34.    Relator is also entitled to recover Relator's attorneys fees, costs and expenses from defendants pursuant to 31 U.S.C. § 3730(d).

## SECOND CLAIM FOR RELIEF

(Violation of 31 U.S.C. § 3730(h) against all defendants)

35.    Relator realleges and incorporates by reference all prior paragraphs of this complaint as though fully set forth at length.

36.    During the course of Relator's employment with AMM (a) Relator complained to defendants, and each of them, that SMG was fraudulently causing CMS to pay excessive

1   capitated payments to SMG's contracted MAOs through the submission of false HCC
2   diagnoses that were unsupported by the SMG patients' medical charts, and (b) Relator
3   investigated, or assisted in the investigation of, SMG's practices of generating and submitting
4   false HCC diagnoses that were unsupported by the SMG patients' medical charts.

5       37.     Because Relator conducted such protected activities, in violation of 31 U.S.C.
6   § 3730(h) defendants discriminated, harassed and/or retaliated against Relator by, among other
7   things, (a) creating a hostile work environment for Relator by, among other things, taking
8   away, or causing to be taken away, Relator's title of and responsibilities as CFO of AMM,
9   taking away from Relator his role in executive decision-making, refusing to acknowledge and
10  take corrective appropriate action in response to Relator's complaints that SMG was
11  committing fraud, waste and abuse by submitting the above-mentioned RAD to SMG's
12  contracted MAOs or CMS, and retaliating against SMG or AMM employees that were
13  suspected of being potential whistleblowers, and (b) constructively terminating Relator's
14  employment during or about March 2019 by subjecting him to such a hostile work
15  environment.

16      38.     As a result of such discrimination, harassment and retaliation, Relator suffered,
17  and will continue to suffer, loss of earnings and employment benefits in an amount exceeding
18  the minimum jurisdiction of this Court.

19      39.     As a result of such discrimination, harassment and retaliation, Relator suffered,
20  and will continue to suffer, emotional distress, worry, anxiety and humiliation in amount
21  according to proof at trial in an amount exceeding the minimum jurisdiction of this Court.

22

23                              PRAYER FOR RELIEF

24      WHEREFORE, Plaintiff and *Qui Tam* Relator prays for relief as follows:

25                         FOR THE FIRST CLAIM FOR RELIEF

26      1.      Treble the Government's damages according to proof;

27      2.      Civil penalties according to proof;

28      3.      A relator's award of up to 30% of the amounts recovered by or on behalf of the

-10-

1 Government;

2     4.    Attorneys fees and expenses pursuant to 31 U.S.C. § 3730(d);

3                FOR THE SECOND CLAIM FOR RELIEF

4     5.    General damages in amount according to proof;

5     6.    Reinstatement with the same seniority status that Relator would have had but for

6 the discrimination and retaliation;

7     7.    Two times the amount of back pay;

8     8.    Interest on the back pay;

9     9.    Loss of future earnings in an amount according to proof;

10     10.   Attorneys fees and expenses pursuant to 31 U.S.C. § 3730(h)(2);

11                FOR ALL CLAIMS FOR RELIEF

12     11.   For costs incurred; and

13     12.   Such other and further relief as the Court deems just and proper.

14                THE ZINBERG LAW FIRM
                  A Professional Corporation
15

16                HANAGAMI LAW
                  A Professional Corporation

17 Dated: June 5, 2020          By: _____

18                   William K. Hanagami
                  Attorneys for Plaintiff and *Qui Tam* Relator,
19                   Paul Pew

20

21                 REQUEST FOR JURY TRIAL

22     Plaintiff and *Qui Tam* Relator hereby requests a trial by jury.

23                THE ZINBERG LAW FIRM
                  A Professional Corporation
24

25                HANAGAMI LAW
                  A Professional Corporation

26 Dated: June 5, 2020          By: _____

27                   William K. Hanagami
                  Attorneys for Plaintiff and *Qui Tam* Relator,
28                   Paul Pew

-11-

